# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————

№ 15-CV-2844 (JFB)

———————————

## FRANK S. MANFRA JR.,

Plaintiff,

VERSUS

## CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY,

Defendant.

———————————

**MEMORANDUM AND ORDER**
August 22, 2016

———————————

JOSEPH F. BIANCO, District Judge:

Plaintiff, Frank Manfra ("Manfra" or "plaintiff"), brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("SSA"), challenging the final decision of the Commissioner of Social Security ("Commissioner"), dated December 20, 2013, denying plaintiff's application for disability insurance benefits ("DIB") beginning on March 15, 2012, through the present. An Administrative Law Judge ("ALJ") found that plaintiff had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), and that although he was unable to perform any past relevant work, there were a number of jobs in the national economy that he could perform. Therefore, the ALJ determined that plaintiff was not disabled, and thus, was not entitled to benefits. The Appeals Council denied plaintiff's request for review.

Plaintiff has moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), or in the alternative, remand, arguing that the ALJ erred by: (1) failing to properly weigh the medical evidence; and (2) failing to properly evaluate plaintiff's credibility. In addition, plaintiff argues that the Appeals Council erred by failing to properly consider new and material evidence when it denied his request for review. The Commissioner has opposed plaintiff's motion and filed a cross-motion for judgment on the pleadings.

For the reasons set forth herein, the Court denies plaintiff's motion for judgment on the pleadings, denies the Commissioner's cross-motion for judgment on the pleadings, and grants plaintiff's motion to remand. Accordingly, the case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order. Remand is warranted because the ALJ failed to properly weigh the opinion of plaintiff's treating physician, Dr. Checo. Although the ALJ cited medical evidence in support of her position,

the ALJ did not address evidence that supported Dr. Checo's opinion, nor did the ALJ apply all of the required factors. Accordingly, remand is warranted.

## I. BACKGROUND

### A. Factual Background

The following summary of the relevant facts is based upon the Administrative Record ("AR") developed by the ALJ. A more exhaustive recitation of the facts is contained in the parties' submissions to the court and is not repeated herein.

#### 1. Personal and Work History

Plaintiff was born on February 18, 1963. (AR at 39, 176.) He was 49 years old on the alleged onset date and 50 years old at the time of the ALJ's decision. (*See id.*) Plaintiff has a high school education. (AR at 40, 156.)

Prior to March 15, 2012, the alleged onset date, plaintiff worked stocking produce at a grocery store. (AR at 40-41, 156-57.) The job required lifting up to 80 pounds. (AR at 157.) Plaintiff worked stocking produce at the same store for nearly 33 years. (AR at 156.)

On December 7, 2012, plaintiff completed a "Function Report," which detailed his daily activities, as well as how his condition affected his ability to perform various tasks. (AR at 164-74.) According to the report, plaintiff lives in a house with his family and is able to travel alone by driving and walking. (AR at 164, 167.) Plaintiff reported that he goes outside "occasionally," depending on how he feels. (AR at 167.) Plaintiff indicated that he has no problem with personal care, and does not need special help or reminders to take care of personal needs and grooming or to take medicine. (AR at 165-66.) Plaintiff reported that he

microwaves his own meals daily, and that his sister also prepares food for him or he has food delivered. (AR at 166-67.) Plaintiff reported that he does "a little cleaning," but that otherwise, he sends out his laundry and his sister takes care of the household. (AR at 167.) Additionally, plaintiff shops for food every other week, in stores or by computer, and can handle paying bills, counting change, and running a savings account. (AR at 168.) Plaintiff mainly socializes with others over the phone or on the computer. (AR at 169.) Plaintiff noted that, before his injuries, he used to go out in public with friends or to eat, but commented that now "leakage disrupts long visits." (AR at 167, 169.) He listed playing sports as a hobby, but indicated that he is no longer able to play. (AR at 168.) Plaintiff also listed television as a hobby and stated that he watches television all day. (*Id.*)

Plaintiff noted that he has problems with incontinence when standing, walking, sitting, and climbing stairs; reported pain with lifting, climbing stairs, and reaching; and indicated that it is "hard to stand back up" after kneeling or squatting. (AR at 169-70.) Plaintiff described his lower back pain as "stabbing" with the pain radiating to his legs, and claimed that the pain can last from "hours to days." (AR at 172-73.) Plaintiff indicated that his back pain began and started to affect his activities in 2011. (AR at 172.) Plaintiff reported that "basic" activities such as "just standing or steps" can bring on pain, depending on how he moves. (AR at 173.) He claimed that he was only able to walk about two blocks before having to stop and rest, and is unable to finish his chores. (AR at 171.) Plaintiff reported that the pain affects his ability to lift and, therefore, his ability to work. (AR at 174.) Plaintiff reported that his back pain and incontinence affect his sleep. (AR at 165.) Plaintiff stated that he treated his back pain with Cyclobenzaprine and Meloxicam, which he began taking in

October 2012, but that they did not relieve his pain for long. (AR at 173.) Plaintiff noted no side effects. (AR at 174.) Additionally, plaintiff reported using a back brace and taking over-the-counter medication. (*Id.*)

## 2. Medical History

On March 15, 2012, plaintiff was admitted to Nassau University Medical Center. (AR at 200-01.) Plaintiff had gone to the emergency room complaining of stomach cramps, excessive urination, blurred vision, decreased appetite, chills, and weight loss of thirty pounds since November 2011. (AR at 201.) Plaintiff's blood pressure was 208/127 on admission. (*Id.*) The examination was remarkable for distended bladder and hyperactive bowl sounds. (*Id.*) Plaintiff's creatinine level was 14.1 mg/dL on admission.[1] (*Id.*) A Computed Tomography ("CT") scan showed a mildly enlarged prostate and urinary bladder distension with wall thickening. (*Id.*) A Foley catheter was used to improve plaintiff's creatinine levels, and he began taking Sevelamer for hyperphosphatemia and Flomax for benign prostatic hyperplasia ("BPH"). (*Id.*) Plaintiff was released, in stable condition, on March 20, 2012. (*Id.*)

On April 5, 2012, plaintiff was admitted to the emergency room at North Shore LIJ Southside Hospital due to recurrent symptoms of his prior hospitalization, including urinary retention and fever after his catheter was removed. (AR at 252-53, 386; *see also* AR 385-581.) Dr. Joanne LaMonica, a urologist, examined plaintiff on April 6, 2012. (AR at 252-53.) At this point, plaintiff's creatinine level was 6.1. (AR at 252.) Dr. LaMonica noted that plaintiff was

too young to have urinary retention due to BPH and advised that his serum PSA be checked. (*Id.*) Dr. LaMonica also noted that prostate cancer could be a possible cause. (*Id.*) On April 6, 2012, plaintiff was also examined by Dr. William Frank. (AR at 281-82.) Dr. Frank noted generally normal findings other than prolonged expiratory phase. (AR at 281.) He also noted that a renal ultrasound revealed a normal right kidney and some mild hydronephrosis in the left kidney. (AR at 282.) Dr. Frank diagnosed sepsis secondary to urinary tract infection, acute renal failure with obstruction of possible underlying chronic renal failure, and possible emphysema and chronic obstructive pulmonary disease ("COPD"). (*Id.*) Plaintiff had a "stable hospital course" and was discharged in stable condition on April 9, 2012. (AR at 386-88.) A Foley catheter was put in place, and his creatinine level dropped to 4.8. (AR at 387.) Discharge diagnoses were: (1) sepsis secondary to pyelonephritis; (2) renal insufficiency, acute on chronic; and (3) obstructive uropathy, most likely secondary to BPH. (AR at 387-88.)

On April 13, 2012, plaintiff had blood drawn for a PSA test for Dr. LaMonica, and results revealed that his PSA level was 5.8. (AR at 254.) Plaintiff saw Dr. LaMonica on April 26, 2012. (AR at 587.) Dr. LaMonica noted that plaintiff's PSA level "has come down to 5.8 from greater than 8" and advised a prostate needle biopsy due to concern of prostate cancer based on plaintiff's family history. (*Id.*) On May 7, 2012, Dr. LaMonica performed a prostate needle biopsy; the results for prostate cancer were negative. (AR at 256, 587.) On May 16, 2012, Dr. LaMonica did a cystoscopic exam, which revealed that plaintiff had a very high bladder

---

[1] The normal range for creatinine in the blood may be 0.84 to 1.21 milligrams per deciliter. *Creatinine Test*, Mayo Clinic, http://www.mayoclinic.org/tests-procedures/creatinine-test/details/results/rsc-20179431 (last visited August 22, 2015). Generally, a high serum creatinine level is a sign of kidney dysfunction. *Id.*

neck. (AR at 587.) Dr. LaMonica recommended a cystoscopy with a transurethral incision of the bladder neck, which she felt could be beneficial in preventing plaintiff from being in urinary retention. (*Id.*) Dr. LaMonica also requested a urodynamic test prior to the cystoscopy to ensure that plaintiff's bladder function was normal. (*Id.*)

On June 12, 2012, plaintiff underwent preoperative cardiac clearance for his upcoming bladder neck surgery. (AR at 279-80.) On June 14, 2012, an EKG revealed a normal sinus rhythm and no acute ischemic abnormalities. (AR at 645.) Plaintiff had a normal cardiac workup and was given clearance for the bladder neck surgery. (*Id.*) Plaintiff underwent a transurethral resection of the prostate ("TURP") on June 18, 2012. (AR at 586.) Following the procedure, on August 1, 2012, plaintiff told Dr. LaMonica that he had worsening urinary incontinence. (AR at 589.) Dr. LaMonica had plaintiff undergo an urodynamic assessment, which showed several leaks throughout the study. (*Id.*) The study also showed that plaintiff could void at a relatively normal rate and could hold a certain volume that was acceptable. (*Id.*) Based on these findings, Dr. LaMonica was unsure where the leak was coming from. (*Id.*) Dr. LaMonica believed the leakage may have been initiated from increased intra-abdominal pressure, and thus, could include a voluntary component. (*Id.*) Dr. LaMonica was confused by plaintiff's history and noted that there was no reason why the TURP procedure would cause incontinence. (*Id.*) Dr. LaMonica referred plaintiff for physical therapy to increase the strength of his pelvic floor muscles. (*Id.*) On September 6, 2012, Dr. LaMonica noted that plaintiff continued to have severe incontinence and prescribed Imipramine. (AR at 590.)

Dr. LaMonica conducted a second urodynamic assessment on October 5, 2012. (AR at 597.) The results of this assessment also showed a non-specific pattern of urinary incontinence and included some elements of stress incontinence along with mixed urgency incontinence. (*Id.*) Dr. LaMonica further noted that, although she sent plaintiff for physical therapy to help with bladder retaining and to increase the strength of the pelvic floor muscles, there was no improvement. (*Id.*) However, Dr. LaMonica noted that the Imipramine seemed to have improved the symptoms somewhat. (*Id.*) Nevertheless, Dr. LaMonica noted that, even with the medication, plaintiff continued to require pads and had leaks with any kind of physical activity. (*Id.*)

On October 5, 2012, Dr. LaMonica completed a bladder problem impairment questionnaire. (AR at 600-04.) Dr. LaMonica indicated that she had treated plaintiff on a monthly basis since April 5, 2012, and had most recently examined plaintiff on the date of the exam. (AR at 600.) Dr. LaMonica diagnosed plaintiff with mixed urinary incontinence and listed his prognosis as "unknown." (*Id.*) Dr. LaMonica indicated that the positive clinical findings supporting her diagnosis were mixed urinary incontinence as evidenced on urodynamic assessment. (*Id.*) Dr. LaMonica listed plaintiff's primary symptoms as bladder outlet obstruction, sepsis, and incontinence. (AR at 601.) Dr. LaMonica noted that plaintiff had some response to Imipramine and no response to Flomax. (*Id.*) Dr. LaMonica opined that plaintiff's impairments would "maybe" be expected to last at least twelve months and that she did not know if plaintiff was a malingerer. (AR at 601-02.) Dr. LaMonica noted that plaintiff was incontinent with physical activity and that urinary urgency would sometimes be a problem. (AR at 602.) Dr. LaMonica

indicated that she believed plaintiff to have psychological or social problems due to the condition, noting that the situation was humiliating, depressing, and affected him socially. (*Id.*) According to Dr. LaMonica, plaintiff was incapable of handling even low stress work, could not "work with food and be incontinent," and would be absent from work more than three times per month due to his impairments or treatment. (AR at 603.) Dr. LaMonica stated that plaintiff needed a job that permitted access to a restroom and that he would "commonly" need to take unscheduled restroom breaks throughout the work day. (*Id.*)

Plaintiff was examined by Dr. Nabil Farakh on October 20, 2012. (AR at 660.) Plaintiff complained of pain in his lumbar spine since lifting a fifty-pound box in November 2011. (*Id.*) He said that, afterwards, he noticed recurrent back pain and weakness of his lower extremities, and also began noticing urinary retention and incontinence. (*Id.*) Plaintiff also reported "some abnormal cracking and noise coming from his lumbar spine with range of motion." (*Id.*) Dr. Farakh's physical examination revealed tenderness of the lumbar spine with paravertebral muscle spasm and tenderness. (*Id.*) Muscle strength was 5/5, and deep tendon reflexes were 2/4 in the bilateral lower extremities. (*Id.*) X-rays of the lumbar spine showed degenerative changes and spondylolisthesis of L2/L3. (*Id.*) Dr. Farakh directed that plaintiff continue follow-up with his urologist, physical therapy and self-exercise, and also ordered magnetic resonance imaging ("MRI") of the lumbar spine. (*Id.*) He also prescribed Flexeril and Mobic. (*Id.*) Plaintiff returned to Dr. Farakh on November 13, 2012, and reported no changes in his symptoms. (AR at 658.) Upon that examination, Dr. Farakh found continued tenderness of the lumbar spine with paravertebral muscle spasm and tenderness,

limited range of motion of the lumbar spine secondary to pain, negative straight leg raise in the bilateral lower extremities, and 5/5 muscle strength and 2/4 deep tendon reflexes in the lower extremities. (*Id.*) Dr. Farakh noted that plaintiff had not started physical therapy or had the MRI since his last visit, and directed that plaintiff begin physical therapy and continue follow-up with a neurologist. (*Id.*) Dr. Farakh also indicated that he might refer plaintiff to a spine surgeon for evaluation of chronic back pain and weakness once the MRI was completed. (*Id.*)

An MRI of the lumbar spine, conducted on November 14, 2012, revealed a very minimal retrolisthesis at L1-L2, with tiny left paracentral disc herniation and annular tear, very minimal retrolisthesis at L2-L3 with mild disk bulge and left lateral disc herniation with annular tear close to the left L2 nerve root, minimal disc bulges from L3 to L5, and a small central disk herniation at L5-S1. (AR at 663.)

Plaintiff returned to Dr. Farakh on December 11, 2012. (AR at 659.) An evaluation of the lumbar spine revealed that plaintiff still had tenderness on the lumbar spine with paravertebral muscle spasms and tenderness, and limited range of motion of the lumbar spine secondary to the pain. (*Id.*) Plaintiff also had negative straight leg raise in the bilateral lower extremities, muscle strength 5/5 bilateral lower extremities, and deep tendon reflexes 2/4 of the patella tendon of the lower extremities. (*Id.*) Dr. Farakh stated that the MRI was consistent with herniated disc of L1, L2 and L2, L3 and L5, S1. (*Id.*) Dr. Farakh noted that he would refer plaintiff to a spine surgeon, and recommended physical therapy and self-exercise with limited heavy activity of the spine. (*Id.*) He also advised plaintiff to use a lumbar brace and follow up with a neurologist. (*Id.*)

At the request of the Social Security Administration, Dr. Shannon Gearhart performed a consultative examination of plaintiff on December 19, 2012. (AR at 610-14.) Plaintiff reported lower back pain for several years, beginning in the 1980s when he was in a motor vehicle accident, which progressively worsened until November 2011, when he felt as though his lower back was "popping" when he lifted a heavy object at work. (AR at 610.) Dr. Gearhart noted that an MRI showed three herniated discs in plaintiff's lumbar spine and impingement of his L2 existing nerve root. (*Id.*) Dr. Gearhart noted that plaintiff had "constant" lower back pain that averaged as a 6 on a 1 to 10 scale, and that, although he had been recommended to physical therapy, he had not attended due to lack of insurance. (*Id.*) Dr. Gearhart noted that plaintiff wore a back brace at all times, which helped with his pain. (*Id.*) Dr. Gearhart also noted that plaintiff had been diagnosed with hypertension in 2011, and has had constant urine leakage since his urinary catheter was removed following his hospitalization in April 2012 and his TURP procedure in June 2012. (*Id.*) Plaintiff told Dr. Gearhart that he believed that the L2 nerve impingement was an attributing cause of his constant urinary incontinence. (*Id.*) Plaintiff also stated that he had been diagnosed with early-stage COPD, in April 2012. (AR at 611.) Plaintiff reported a history of left knee surgery in 1995, and said that he now had arthritis in the left knee with pain upon walking over a half block at a time, going up more than one flight of stairs, or prolonged sitting or standing. (*Id.*) Plaintiff told Dr. Gearhart that he could dress himself daily, showered two to three times per week, cooked with a microwave only, did light cleaning, and spent time watching television, listening to the radio, and socializing with friends. (AR at 612.)

Upon examination, Dr. Gearhart found plaintiff's blood pressure to be elevated, 150/100, and advised him to see his primary care physician within a week. (*Id.*) Dr. Gearhart noted that plaintiff appeared to be in no acute distress during the examination, had a normal gait, could walk on his heels and toes without difficulty, fully squatted, and needed no assistive devices or help changing for the exam, getting on or off the table, or rising from the chair. (*Id.*) Dr. Gearhart noted lumbar spine flexion to 70 degrees and extension to 40 degrees, straight leg raising as negative on the right and positive on the left at 10 degrees, and limited range of motion in the hips and knees. (AR at 613.) No sensory defects were noted, and plaintiff had full, 5/5, strength in all extremities. (*Id.*) Dr. Gearhart diagnosed lower back pain, left knee pain, chronic renal failure, hypertension, and COPD. (AR at 614.) She found plaintiff's prognosis to be fair as to all diagnoses but his COPD, which she indicated was "stable." (*Id.*) Dr. Gearhart opined that plaintiff had "marked" restrictions in heavy lifting, carrying, pushing and pulling, as well as "moderate" restrictions in walking, standing, sitting, and going up and down stairs. (*Id.*) Dr. Gearhart also stated that plaintiff needed to avoid smoke, dust, and other known respiratory irritants. (*Id.*)

On January 2, 2013, Dr. Aaron J. Woodall, a urologist, examined plaintiff. (AR at 636.) A post-void residual urine test was conducted with 13cc of urine remaining in the bladder after urination. (*Id.*) A urinalysis showed a trace amount of blood present. (*Id.*) Dr. Woodall prescribed Imipramine and Detrol and told plaintiff that he would consider performing an anti-incontinence procedure once plaintiff's spinal evaluation was complete. (*Id.*)

On January 4, 2013, plaintiff was seen by Dr. Fernando J. Checo, an orthopedic

surgeon, for an evaluation for cauda equine as the possible etiology of his urinary incontinence. (AR at 622.) Plaintiff reported difficulty voiding and in starting urination. (*Id.*) Upon examination, plaintiff had a normal gait and minimal pain to flexion, extension, lateral bending, and rotation. (AR at 623.) Dr. Checo reviewed the November 14, 2012 lumbar MRI, which showed that plaintiff had a minimal disc bulge at L3-L4, L4-L5, a small central disk herniation at L5-S1 with no central compression or foraminal compression, and a small retrolisthesis at L1-2 and L2-3. (*Id.*) Dr. Checo diagnosed degenerative disc disease of the lumbar spine, but found no clinical symptoms consistent with cauda equine. (*Id.*)

Dr. Mary Lanette Rees, a State agency medical consultant, reviewed the evidence of record on February 5, 2013, and stated that she agreed with the residual functional capacity ("RFC") assessment for light work with appropriate postural and environmental restrictions, as previously provided by the State agency single decision maker. (AR at 626-27.)

On February 20, 2013, plaintiff returned to Dr. Checo for back pain. (AR at 687.) A physical examination revealed that plaintiff had a normal gait but "a lot of mechanical symptoms," including pain with flexion, extension, lateral bending and rotation, pain over the paralumbar muscles right ride worse then left, and pain over the spinous processes. (AR at 668.) Plaintiff had negative leg raises bilaterally, but did have some pain in the back. (*Id.*) Plaintiff also had diminished range of motion to flexion; specifically, he could flex to about 40 degrees, extend to neutral, and had about 30 degrees of loss of lateral bending on the right and left side. (*Id.*) Dr. Checo diagnosed lumbar degenerative disc disease at L3-L4 and L4-L5, lumbar disc herniations at L3-L4, L4-L5, and L5-S1,

lumbar spondylosis, and lumbar sprain. (*Id.*) Dr. Checo made a referral to physical therapy and recommended the use of anti-inflammatories for as long as plaintiff's primary care physician believed it was permissible for him to take them. (*Id.*)

Dr. Checo also completed a Lumbar Spine Impairment Questionnaire on February 20, 2013, in which he restated his diagnoses from his examinations of plaintiff. (AR at 629-35.) The clinical findings Dr. Checo listed included limited range of motion at 20 degrees extension and 50 degrees flexion, tenderness at the lumbar muscles, muscle spasms at the right lumbar/sacral back, abnormal gait evidenced by forward leaning posture, muscle atrophy at bilateral quads, and trigger points at the lumbar/sacral facet joints. (AR at 629-30.) Dr. Checo indicated that plaintiff had no swelling, sensory loss, reflex changes, muscle weakness, crepitus, or positive straight leg raising tests. (AR at 630.) Dr. Checo cited the November 14, 2012 MRI, L1-L2 paracentral disc herniation and annular tear, L2-L3 central disc herniation, and L5-S1 central herniation to support his diagnoses. (*Id.*) Plaintiff's primary symptoms included mechanical back pain with flexion, extension, and lateral bending, and pain to palpation over the lumbar/sacral muscles. (*Id.*) The nature of the pain resulted from muscle sprain, spasms, and degenerative disc disease located in the lumbar/sacral area. (AR at 631.) Dr. Checo noted that plaintiff's pain was constant when he was upright and only improved when he was lying down. (*Id.*) The pain was precipitated by sitting for long periods of time, twisting, and bending. (*Id.*) Dr. Checo indicated that he had not been able to completely relieve plaintiff's pain without unacceptable side effects. (*Id.*)

Dr. Checo further opined that plaintiff was able to sit for a total of four hours in an eight-hour work day and stand/walk for two

hours in an eight-hour work day. (*Id.*) Dr. Checo also opined that plaintiff needed to get up and move around for fifteen minutes on an hourly basis. (AR at 632.) He explained that plaintiff had the ability to frequently lift and carry up to five pounds and occasionally up to ten pounds, but never more. (*Id.*) Dr. Checo stated that plaintiff's symptoms were frequently severe enough to interfere with his attention and concentration, that his impairments were likely to last at least twelve months, and that plaintiff was only capable of tolerating low stress in the workplace because flare-ups from mechanical pain and degenerative arthritis were caused by too much activity. (AR at 633.) Dr. Checo indicated that emotional factors did not contribute to the severity of plaintiff's symptoms and functional limitations. (*Id.*) Dr. Checo opined that plaintiff would have good days and bad days, that he would need to take unscheduled breaks to rest every two hours in an eight-hour work day, and that he would likely be absent from work more than three times per month as a result of his impairments or treatments. (AR at 634.) According to Dr. Checo, plaintiff was not a malingerer. (AR at 633.) Dr. Checo also noted that plaintiff should avoid fumes, gases, dust, heights, pushing, pulling, kneeling, bending, and stooping. (*Id.*)

On February 27, 2013, Dr. Woodall examined plaintiff and ordered a PSA test. (AR at 637.) Dr. Woodall also referred plaintiff for an incontinence evaluation. (*Id.*)

Plaintiff returned to Dr. Checo on April 17, 2013, and reported pain over his right thigh that was occasionally shooting in nature. (AR at 684.) A physical examination found a normal gait with a slight leaned forward posture and pain over the paralumbar muscles bilaterally. (AR at 685.) During the physical examination, plaintiff had full 5/5 strength in his legs, and the straight leg raising tests were negative. (*Id.*) Dr. Checo ordered an electromyogram ("EMG") to evaluate for radiculopathy due to plaintiff's discomfort in his right thigh, and also recommended that plaintiff continue to take Mobic and attend physical therapy. (*Id.*) However, plaintiff told Dr. Checo that he could not afford the co-pay for physical therapy. (*Id.*) An EMG conducted on April 25, 2013, showed no evidence of lumbosacral radiculopathy or peripheral neuropathy. (AR at 693-94.)

Dr. Checo examined plaintiff again on May 22, 2013. (AR at 682.) Plaintiff reported that his symptoms were about 30 to 40 percent improved, which he believed may have been due to the anti-inflammatory medication. (*Id.*) Dr. Checo's findings remained essentially the same as those from the April 17, 2013 examination. (AR at 683.)

On June 25, 2013, plaintiff returned to Dr. Checo, describing pain with mechanical symptoms, though he said he was about thirty percent better since his last evaluation. (AR at 680.) During the examination, Dr. Checo found pain with flexion, extension, lateral bending and rotation, as well as pain over the L5-S1 facet joints bilaterally. (AR at 681.) Dr. Checo recommended that plaintiff continue taking anti-inflammatories and noted that he would be referring plaintiff to Dr. Nambiar to evaluate for possible injections. (*Id.*) Dr. Checo found no additional symptoms or diagnoses when he examined plaintiff on August 6, 2013. (AR at 678-79.) He gave plaintiff a prescription for massage therapy, and advised plaintiff to continue taking Mobic and to do home physical therapy. (AR at 679.) Dr. Checo noted that if plaintiff's back symptoms did not improve in six weeks, he would recommend an epidural injection by Dr. Nambiar. (*Id.*)

On September 30, 2012, Dr. Woodall completed a bladder problem impairment questionnaire. (AR at 697-701.) Dr. Woodall noted that plaintiff had been his patient since April 12, 2012, and he had seen him every couple of months. (AR at 697.) He diagnosed incontinence and noted that there was clinical evidence of microscopic hematuria, efflux from the bilateral ureter, and status post TURP. (*Id.*) Dr. Woodall noted that plaintiff's primary symptoms were incontinence and decreased urine stream, and indicated that only plaintiff's statements supported his diagnosis. (AR at 698.) Dr. Woodall reported that plaintiff's symptoms and functional limitations were not reasonably consistent with his physical and or emotional impairments because with incontinence a patient can sit, stand, and perform job duties. (*Id.*) He noted that plaintiff was referred to Dr. Faroozi, but did not go. (*Id.*) Dr. Woodall indicated that he prescribed Detrol and had substituted medications in an attempt to produce less symptomatology or relieve side effects. (*Id.*) Dr. Woodall noted that, according to plaintiff, the urinary incontinence problem was occasional, and did not opine as to how often plaintiff must urinate or how frequently urinary urgency would be a problem. (AR at 699.) Dr. Woodall indicated that plaintiff's impairments had lasted or could be expected to last at least twelve months, and that urinary frequency and or incontinence are known side effects of the TURP procedure. (AR at 698-99.) Dr. Woodall did not answer whether he thought plaintiff was a malingerer and said that he did not know whether plaintiff had developed psychological or social problems due to the condition. (AR at 699.) Dr. Woodall also noted that the degree to which plaintiff could tolerate work stress was "unknown." (AR at 699-700.) Because Dr. Woodall found that plaintiff's impairments were not likely to "produce 'good days' and 'bad days,'" he did not estimate how frequently plaintiff was likely to be absent from work based on the impairments or treatment. (AR at 700.) However, Dr. Woodall opined that plaintiff would need a job with ready access to a bathroom and would sometimes need to take five-minute unscheduled bathroom breaks during the eight-hour work day (*Id.*)

### 3. Additional Medical Evidence Submitted to Appeals Council

As part of his appeal, plaintiff submitted additional records from Dr. Woodall and Dr. P. Leo Varriale, an orthopedist who first examined plaintiff on June 2, 2014. (*See* AR at 2, 5.)

On May 23, 2013, a hematuria protocol CT scan performed by Dr. Woodall showed a slight disproportionate diminution in size of plaintiff's right kidney relative to the left. (AR at 702.) However, Dr. Woodall noted that disproportionate size was of doubtful significance without associated cortical atrophy and indicated that the kidneys were otherwise unremarkable. (*Id.*) Dr. Woodall opined that plaintiff appeared to have a TURP defect in the prostate and a diffusely moderately thickened urinary bladder, "which may represent the sequela of chronic outlet obstruction yet correlate." (*Id.*)

At his initial examination with Dr. Varriale on June 2, 2014, plaintiff complained of lower back pain, which radiated to his right knee. (AR at 710.) Dr. Varriale noted that plaintiff reported that he had taken prescription medications in the past, but had stopped because he did not have insurance and could not afford the medication, and thus, was currently taking Advil and Tylenol as needed. (*Id.*) Dr. Varriale reviewed the November 2012 MRI, reports from Dr. LaMonica, Dr. Farakh, and Dr. Checo, a January 2013 impairment

questionnaire from the Central Orthopedic Group, and an April 2013 electrodiagnostic report from Dr. Alan Wolf. (AR at 711.) Examination revealed mild spasms in the lumbar spine, lumbar extension limited to 0 degrees and flexion to 30 degrees, positive straight leg raising bilaterally, decreased sensation at the right mid-tibia, and decreased right knee reflexes. (*Id.*) Plaintiff displayed full strength in his legs. (*Id.*) Dr. Varriale diagnosed chronic lumbar radiculopathy, and opined that, based on his physical examination, case history, and file, plaintiff was presently, "permanently totally disabled from any type of work." (*Id.*)

On June 4, 2014, Dr. Varriale completed a spinal impairment questionnaire. (AR at 703-08.) In the questionnaire, Dr. Varriale reiterated his diagnosis. (*See id.*) Dr. Varriale's clinical findings included limited range of motion, tenderness, and muscle spasms in the lumbosacral spine, sensory loss in the legs, and reflex changes in the knees. (AR at 704.) Additionally, Dr. Varriale noted positive straight leg raising bilaterally and bladder incontinence. (*Id.*) Dr. Varriale opined that plaintiff could sit for two hours and stand and/or walk for one hour in an eight-hour workday. (AR at 705.) Dr. Varriale further noted that it was medically necessary for plaintiff to avoid continuous sitting in an eight-hour workday, and that plaintiff must get up from a seated position to move around every twenty minutes for ten minutes each time. (AR at 706.) Dr. Varriale opined that plaintiff could occasionally lift and carry up to ten pounds, but could never or rarely lift or carry more than ten pounds. (*Id.*) Dr. Varriale noted that plaintiff could ambulate effectively, and did not require a cane or other assistive device to stand or walk, and did not have significant limitations in reaching, handling, or fingering. (AR at 706-07.) Dr. Varriale noted that plaintiff's symptoms would likely increase if placed in a competitive work environment, that plaintiff's experience of pain, fatigue, or other symptoms would frequently be severe enough to interfere with his attention and concentration, and that he would need to take unscheduled and unpredictable breaks to rest during the work day. (AR at 707.) Dr. Varriale opined that plaintiff's condition was expected to last at least twelve months, that he was not a malingerer, and that he could not work. (AR at 707-08.) Finally, Dr. Varriale indicated that he believed that plaintiff's symptoms and limitations applied back as far as March 15, 2012. (AR at 708.)

### 4. Testimony at the Administrative Hearing

#### a. Plaintiff's Testimony

Plaintiff testified before the ALJ on November 8, 2013. (AR at 38-56.) He testified that he had been unable to work since March 2012, due to back pain, incontinence, weakness, and shortness of breath. (AR at 41-42.) Plaintiff explained that he was admitted to the hospital with sepsis in March 2012, and thereafter had TURP surgery. (AR at 41, 53.) He was placed on disability from his job as a produce worker at Pathmark, but was fired once those benefits ran out. (AR at 42.) Plaintiff testified that he takes medication for his back pain and has been prescribed cortisone shots, but he has delayed the injections because he is afraid of the shots based on information he has heard about them. (AR at 43-44.) He testified that he has been referred to other doctors for alternative treatment options, including massage therapy and physical therapy, but did not go because they did not accept his insurance. (AR at 49, 51.) Plaintiff testified that, although Dr. Checo's June 25, 2013 evaluation indicated that he reported being thirty percent better since his last evaluation, that was "not really" correct. (AR at 51.)

Plaintiff discussed his embarrassment at having to wear adult diapers, which often leaked, smelled, and had to be changed frequently. (AR at 46.) Plaintiff estimated that he could sit for 30-40 minutes before his back pain became severe enough that he had to get up and move around, but mentioned that once he got up to relieve his back pain, he experienced leakage. (AR at 52.) He also estimated that he could stand for the same amount of time before it became too painful, but mentioned that he could only walk the distance of three houses down, due to shortness of breath and back pain. (AR at 52-53.) Plaintiff told the ALJ that his pain, fatigue, and weakness always affected his ability to think. (AR at 54.) Plaintiff admitted that he smoked a pack and a half of cigarettes per day. (AR at 42, 54.)

Plaintiff testified that he currently lives with his sister, and that a typical day was spent watching television, or playing guitar. (AR at 40, 47, 50.) Plaintiff stated that he does not go out much and had become a "hermit." (AR at 49.) He testified that, despite the leakage and incontinence, he only showers twice a week due to his back pain and difficulty getting in and out of the shower. (AR at 47.)

b.  Vocational Expert Testimony

A vocational expert, Edna Clark, also testified at the administrative hearing on November 8, 2013. (*See* AR at 56-62.) Ms. Clark testified that a hypothetical individual of plaintiff's age, education, and work history that is limited to light work in that he could occasionally lift twenty pounds; frequently lift ten pounds; sit for up to six hours, stand or walk for approximately six hours in an eight-hour day; occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch and crawl; push and pull without

limits; must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation; and needs a break of up to five minutes every two hours and ready access to a restroom could not perform plaintiff's past work. (AR at 58.) However, Ms. Clark found that there were other jobs in the national economy that such an individual could perform, including hand trimmer, final assembler, and office helper. (AR at 58-59.) Ms. Clark explained that if the individual was further restricted to taking a five-minute break every hour, such an individual could not do the other jobs described. (AR at 59.) Ms. Clark further testified that if the individual was limited to taking a ten to fifteen minute break every two hours, such an individual could not perform the alternate jobs she described. (AR at 61.)

B.  Procedural History

On September 25, 2012, plaintiff applied for DIB, alleging disability since March 15, 2012, due to lumbar spine impairment, herniated disc, and bladder impairment. (AR at 127-33, 155; *see* AR at 74 (showing effective filing date)). Plaintiff's application was initially denied on December 27, 2012, (AR at 78-81), and plaintiff then requested a hearing before an ALJ, (AR at 87-88). Upon an informal remand to the state agency, a revised determination was issued denying plaintiff's claim. (AR at 75.) On November 8, 2013, plaintiff appeared with an attorney before ALJ April W. Wexler. (AR at 36-63.) After considering the case *de novo*, the ALJ issued a decision on December 20, 2013, finding that, although plaintiff had the severe impairments of incontinence and a back impairment, plaintiff retained the RFC to perform light work as defined in 20 CFR 404.1567(b). (AR at 23-24.) Based on plaintiff's RFC, the ALJ determined that plaintiff was unable to perform his past work, but was "capable of making a successful

adjustment to other work that exists in significant numbers in the national economy." (AR at 30.) Thus, the ALJ determined that plaintiff was not disabled under the Act. (*Id.*)

On January 7, 2014, plaintiff requested review of the ALJ's decision by the Appeals Council. (AR at 16.) The Appeals Council denied the request on March 20, 2015, making the ALJ's decision the final decision of the Commissioner. (AR at 1-7.)

Plaintiff commenced this action on May 18, 2015, appealing the ALJ's December 20, 2013 decision. The Commissioner served the administrative record and filed an answer on August 17, 2015. On November 19, 2015, plaintiff filed his motion for a judgment on the pleadings. On January 11, 2016, the Commissioner responded and filed a cross-motion for a judgment on the pleadings. The matter is fully submitted.

## II. STANDARD OF REVIEW

A district court may set aside a determination by an ALJ "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek v. Colvin*, 802 F.3d 370, 374-75 (2d Cir. 2015) (citing *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); 42 U.S.C. § 405(g)). The Supreme Court has defined "substantial evidence" in Social Security cases to mean "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted); *see Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013). Furthermore, "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*,

143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (internal citation and quotation marks omitted); *see also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner.").

## III. DISCUSSION

### A. The Disability Determination

A claimant is entitled to disability benefits if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the SSA unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to

determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the four step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with respect to the first four steps; the Commissioner bears the burden of proving the last step. *Id.*

The Commissioner "must consider" the following in determining a claimant's entitlement to benefits: "'(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience.'" *Id.* (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

## B. Analysis

According to plaintiff, the ALJ erred by failing to properly weigh the medical evidence and by failing to properly evaluate his credibility. As set forth below, the Court agrees that the ALJ erred by failing to adequately explain the reasons for determining that the opinion of plaintiff's treating physician, Dr. Checo, should not be afforded controlling weight, and remands on this basis.

### 1. The ALJ's Decision

Here, in concluding that plaintiff was not disabled under the SSA, the ALJ adhered to the five-step sequential analysis for evaluating applications for disability benefits. (AR at 23-30.)

#### a. Substantial Gainful Activity

At step one, the ALJ must determine whether the claimant is presently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(b). "Substantial work activity is work activity that involves doing significant physical or mental activities," *id.* § 404.1572(a), and gainful work activity is work usually done for pay or profit, *id.* § 404.1572(b). Individuals who are employed are engaging in substantial gainful activity.

Here, the ALJ determined that the claimant had not engaged in substantial gainful activity since March 15, 2012, the alleged onset date. (AR at 23.) Substantial evidence supports this finding, and plaintiff does not challenge its correctness.

#### b. Severe Impairment

At step two, if the claimant is not employed, the ALJ then determines whether the claimant has a "severe impairment" that

13

limits his capacity to work. An impairment or combination of impairments is "severe" if it significantly limits an individual's physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c); *see also Perez*, 77 F.3d at 46.

Here, the ALJ found that plaintiff had the severe impairments of incontinence and back impairment. (AR at 23.) The ALJ stated that, although plaintiff alleged COPD, there was no evidence in the record to support plaintiff's allegation that COPD was a severe impairment, within the meaning of the Act and Regulations. (*Id.*) Substantial evidence supports these findings, and plaintiff does not challenge their correctness.

c.   Listed Impairments

At step three, if the claimant has a severe impairment, the ALJ next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the ALJ will find the claimant disabled without considering the claimant's age, education, or work experience. 20 C.F.R. § 404.1520(d).

Here, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (AR at 24.) Substantial evidence supports this finding, and plaintiff does not challenge its correctness.

d.   Residual Function Capacity and Past Relevant Work

If the severe impairments do not meet or equal a listed impairment, the ALJ assesses the claimant's residual functional capacity "based on all the relevant medical and other evidence in [the] case record." 20 C.F.R. §

404.1520(e). The ALJ then determines at step four whether, based on the claimant's residual functional capacity, the claimant can perform his past relevant work. *Id.* § 404.1520(f). When the claimant can perform her past relevant work, the ALJ will find that he is not disabled. *Id.*

In this case, the ALJ found that the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). (AR at 24.) The ALJ concluded that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds; sit for up to six hours; stand and walk for approximately six hours in an eight-hour work day with normal breaks; occasionally climb ramps or stairs; never climb ladders, ropes or scaffolds; and occasionally balance, stoop, kneel, crouch and crawl. (*Id.*) Additionally, the ALJ found that plaintiff had no limitation in his ability to push or pull, but must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (*Id.*) The ALJ concluded that plaintiff needed a break up to five minutes every two hours and ready access to a restroom. (*Id.*)

After consideration of the evidence, the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (AR at 25.) However, the ALJ then concluded that plaintiff's statements concerning the persistence, intensity, and limiting effects of these symptoms were "not entirely credible." (*Id.*) The ALJ provided a summary of the medical evidence and plaintiff's testimony. (*See* AR at 25-28.) The ALJ gave "some weight" to the opinions of treating urologist Dr. LaMonica because, although her assessment was partially consistent with that of another treating urologist, Dr. Woodall, the ALJ found that Dr. LaMonica's opinion that plaintiff could not tolerate work-related stress, would be

absent more than three times per month, and would not be able to work with food was not supported by the record and was inconsistent with opinions of other treating and examining physicians. (AR at 26-27.) The ALJ gave "little weight" to treating orthopedic surgeon Dr. Checo's opinion as to plaintiff's disability, finding that it was not supported by his own physical and diagnostic examination findings, which revealed very minimal abnormalities in the lumbar spine region. (AR at 27-28.) Additionally, the ALJ noted that he gave Dr. Checo's opinion little weight because it was inconsistent with plaintiff's conservative treatment history and plaintiff's testimony regarding his daily functioning. (AR at 28.) The ALJ also determined that, although some weight should be given to the consultative examiner Dr. Gearhart's assessment of plaintiff's RFC, "little weight" should be given to her determination of disability because "her medical source statement was grossly inconsistent with her own physical examination findings." (AR at 27-28.) However, the ALJ gave great weight to Dr. Woodall's opinion and assessment of plaintiff's residual functional capacity, relating to the incontinence issue, finding it was "supported by substantial evidence of record, the conservative treatment history, poor treatment compliance as well as the claimant's own testimony regarding his daily activities." (AR at 28.)

Plaintiff claims that the ALJ failed to properly weigh the medical opinion evidence, specifically with respect to Dr. Checo, and thus, failed to properly determine his residual functional capacity. For the reasons set forth *infra,* the Court finds that there were legal errors in connection with the ALJ's assessment of plaintiff's residual functional capacity. Specifically, the ALJ, in giving little weight to Dr. Checo's opinion, failed to properly evaluate the various factors that must be considered when determining how much weight to give a treating physician's opinion. Due to this error, remand is necessary because the Court cannot determine whether substantial evidence supports the ALJ's decision. *See Noutsis v. Colvin*, No. 14–CV–5294 (JFB), 2016 WL 552585, at *7 (E.D.N.Y. Feb. 10, 2016); *Branca v. Comm'r of Soc. Sec.*, No. 12–CV–643 (JFB), 2013 WL 5274310, at *11 (E.D.N.Y. Sept. 18, 2013).

e.     Other Work

At step five, if the claimant is unable to perform her past relevant work, the ALJ determines whether the claimant is capable of adjusting to performing any other work. 20 C.F.R. § 404.1520(g). To support a finding that an individual is not disabled, the Commissioner has the burden of demonstrating that other jobs exist in significant numbers in the national economy that claimant can perform. *Id.* § 404.1560(c); *see, e.g.*, *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).

In this case, the ALJ concluded that plaintiff could not return to his past relevant work as a produce worker, but concluded that, "considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (AR at 29-30.) When making this determination, the ALJ considered the testimony given by the Vocational Expert, Edna F. Clark, at the November 8, 2013, hearing. (AR at 30; *see also* AR at 56-62.) For the reasons set forth below, the court finds that there were legal errors in connection with the ALJ's assessment of plaintiff's residual functional capacity.

## 2. Treating Physician Rule

Plaintiff argues, among other things, that the ALJ failed to follow the treating physician rule when she accorded little weight to his treating orthopedist, Dr. Checo. The Court agrees that the ALJ failed to apply the proper standard for evaluating the medical opinion of Dr. Checo, and remands the case on this basis.

### a. Legal Standard

The Commissioner must give special evidentiary weight to the opinion of a treating physician. *See Greek*, 802 F.3d at 375 ("The SSA recognizes a rule of deference to the medical views of a physician who is engaged in the primary treatment of a claimant."); *see also Clark*, 143 F.3d at 118. The "treating physician rule," as it is known, "mandates that the medical opinion of a claimant's treating physician [be] given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *see also Greek*, 802 F.3d at 375; *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). The rule, as set for in the regulations, provides:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R § 404.1527(c)(2).

Although treating physicians may share their opinion concerning a patient's inability to work and the severity of the disability, the ultimate decision of whether an individual is disabled is "reserved to the Commissioner." *Id.* § 404.1527(d)(1); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability.").

When the Commissioner decides that the opinion of a treating physician should not be given controlling weight, she must "give good reasons in [the] notice of determination or decision for the weight [she] gives [the claimant's] treating source's opinion." 20 C.F.R. § 404.1527(c)(2); *see Perez v. Astrue*, No. 07-CV-958 (DLJ), 2009 WL 2496585, at *8 (E.D.N.Y. Aug. 14, 2009) ("Even if [the treating physician's] opinions do not merit controlling weight, the ALJ must explain what weight she gave those opinions and must articulate good reasons for not crediting the opinions of a claimant's treating physician."); *Santiago v. Barnhart*, 441 F. Supp. 2d 620, 627 (S.D.N.Y. 2006) ("Even if the treating physician's opinion is contradicted by substantial evidence and is thus not controlling, it is still entitled to significant weight because the treating source is inherently more familiar with a claimant's medical condition than are other sources." (internal quotation marks and citation

omitted)). Specifically, "[a]n ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). "Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)); *see also Greek*, 802 F.3d at 375. "After considering the above factors, the ALJ must 'comprehensively set forth [her] reasons for the weight assigned to a treating physician's opinion.'" *Burgess,* 537 F.3d at 129 (quoting *Halloran,* 362 F.3d at 33). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is ground for a remand." *Snell*, 177 F.3d at 133.

b. Analysis

The Court finds that the ALJ failed to apply the proper standard for evaluating the opinion of Dr. Checo.

The ALJ stated that, because Dr. Checo's assessment was not supported by his own physical and diagnostic examination findings and was inconsistent with the conservative treatment history and plaintiff's own testimony regarding his daily functioning, she would be according the opinion little weight in consideration of disability in this case. (AR at 28.) As discussed below, the reasons given by the ALJ for rejecting Dr. Checo's opinion are insufficient. Accordingly, the case must be remanded to the ALJ for further consideration of Dr. Checo's opinion in light of this Court's analysis.

The Court concludes that the ALJ did not set forth in sufficient detail the reasons for affording "little weight" to Dr. Checo's opinion. The Second Circuit has repeatedly noted that an ALJ must "set forth her reasons for the weight she assigns to the treating physician's opinion." *Shaw*, 221 F.3d at 134; *see also Taylor v. Barnhart*, 117 F. App'x 139, 140-41 (2d Cir. 2004) (remanding case because ALJ "did not give sufficient reasons explaining how, and on the basis of what factors, [the treating physician's] opinion was weighed," and stating that "we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion" (internal quotation marks and citation omitted)); *Torres v. Comm'r of Soc. Sec.*, No. 13-CV-330 (JFB), 2014 WL 69869, at *13 (E.D.N.Y. Jan. 9, 2014) (finding error where ALJ assigned only "some weight" to opinion of treating physician without considering the 20 C.F.R. § 404.1527(d)(2) factors); *Black v. Barnhart*, No. 01-CV-7825(FB), 2002 WL 1934052, at *4 (E.D.N.Y. Aug. 22, 2002) ("[T]he treating physician rule required the ALJ . . . to clearly articulate her reasons for assigning weights.").

First, the ALJ noted that Dr. Checo's opinion was not supported by his own physical and diagnostic examination findings, explaining that these findings only showed very minimal abnormalities in the lumbar spine. (AR at 28.) However, a review of the ALJ's decision demonstrates that she failed to properly consider Dr. Checo's examination findings. Specifically, in discussing Dr. Checo's impairment questionnaire, the ALJ noted that Dr. Checo

reported limited range of motion with lumbar extension and flexion, tenderness and muscle spasm over the lumbrosacral spine area, and trigger points at the lumbrosacral facet joints; however, the ALJ reported that Dr. Checo "reported forward leaning posture, but no other abnormalities" (AR at 27), which is inconsistent with both the ALJ's prior recitation of the clinical findings noted in Dr. Checo's questionnaire and the questionnaire itself, which indicated multiple abnormal clinical findings. (AR at 629-30.) Further, although the ALJ found that Dr. Checo's findings showed only very minimal abnormalities in the lumbar spine, at no point did the ALJ discuss which physical and diagnostic examination findings demonstrated only minor abnormalities. Further, the ALJ did not mention that Dr. Checo cited the November 14, 2012 MRI, L1-L2 paracentral disc herniation and annular tear, and L2-L3 central disc herniation, and L5-S1 central herniation to support his diagnoses. (AR at 630.)[2] Thus, the ALJ failed to properly consider Dr. Checo's evidence in support of his opinion.

Apart from not addressing the findings made by Dr. Checo that were consistent with his opinion, the ALJ also failed to address other medical evidence in the record that was consistent with Dr. Checo's opinion. *See Clark*, 143 F.3d at 118. Specifically, although the ALJ mentioned a November 13, 2012 physical examination by Dr. Farakh and noted that Dr. Farakh found tenderness of the lumbar spine with paravertebral muscle spasms, but that the rest of the physical examination was within normal limits (AR at 25), the ALJ did not discuss that the November 13, 2012 examination by Dr.

Farakh included x-rays of the lumbar spine, which showed degenerative changes and spondylolisthesis, as well as deep tendon reflexes of 2/4 in the lower extremities. (AR at 608.) The ALJ also failed to discuss Dr. Farakh's November 14, 2012 examination of plaintiff, where he noted a limited range of motion of lumbar spine secondary to the pain. (AR at 609.) These findings by Dr. Farakh are consistent with Dr. Checo's findings and support the notion that plaintiff has more than just minimal abnormalities in his lumbar spine, as the ALJ found.

Further, the ALJ did not point to any other doctor in the record whose clinical findings conflict with Dr. Checo's opinion. Although the ALJ afforded great weight to Dr. Woodall, who opined that plaintiff retained the ability to sit, stand, and perform job duties, and found that claimant's symptoms and alleged functional limitations were not consistent with objective physical examination findings (AR at 28), Dr. Woodall treated plaintiff for incontinence, rather than for his back problems.

Additionally, the ALJ found that Dr. Checo's opinion should be accorded little weight because it was "inconsistent with the conservative treatment history." (AR at 28.) Although the ALJ used the terminology "conservative treatment history," it appears that the ALJ was actually alluding to plaintiff's non-compliance with Dr. Checo's course of treatment, rather than the prescribed treatment itself. (*See* AR at 26 ("The doctor noted that, despite earlier recommendations, the claimant did not participate in the prescribed physical therapy treatment. . . . In April 2013, Dr. Checo once

<hr>

[2] Additionally, although the ALJ noted that, during Dr. Checo's April 17, 2013 examination of plaintiff, Dr. Checo noted a normal walk with slight leaned forward posture, spinous processes that were intact, negative straight leg-raising tests bilaterally, and a neurological

examination that was within normal limits (AR at 26), she did not mention that Dr. Checo also discussed that plaintiff had pain over the paralumbar muscles, right and left, and small disc herniations and bulges. (AR at 685.)

again reported that the claimant was not compliant with the treatment regimen. He did not start physical therapy and did not take the prescribed anti-inflammatory medications.").) When properly considered, a plaintiff's compliance with a course of treatment goes to a plaintiff's credibility, rather than the weight a doctor's opinion is assigned. *See Berardo v. Astrue*, No. 08-CV-0642 (TJM), 2010 WL 3604149, at *5 (N.D.N.Y. May 26, 2010) ("[T]he ALJ properly considered Plaintiff's testimony that she sought treatment infrequently because she lacked the money to pay for care in his credibility assessment"), *report and recommendation adopted*, No. 08-CV-642, 2010 WL 3522484 (N.D.N.Y. Sept. 2, 2010); *Canabush v. Comm'r of Soc. Sec.*, No. 1:13-CV-429 (FJS/CFH), 2015 WL 1609721, at *7 (N.D.N.Y. Apr. 10, 2015) ("The ALJ did not reference plaintiff's failure to manage and treat his diabetes properly to negate other compelling evidence or as the sole reason for discrediting his testimony, but properly mentioned it as one of the factors used in analyzing plaintiff's credibility"); *Pimenta v. Barnhart*, No. 05-CIV-5698 (JCF), 2006 WL 2356145, at *6 (S.D.N.Y. Aug. 14, 2006) ("The ALJ's reasoning extended no further than the conclusory statement that 'this is a classic case of a claimant's failure to follow prescribed treatment.' . . . It is impossible to determine from the ALJ's decision what role this conclusion played in his finding that plaintiff was not disabled and not credible." (internal citation omitted)). Thus, any consideration of plaintiff's compliance with Dr. Checo's course of treatment should have been considered in reference to plaintiff's credibility rather than the weight to give Dr. Checo's opinion as a treating physician.[3]

---

[3] Further, the ALJ's perception that the claimant was non-compliant in taking his anti-inflammatory medication is not grounded in fact. In her decision, the ALJ noted that, based on Dr. Checo's August 6, 2013 examination, the claimant "finally" began to take anti-inflammatory medications on a per-needed basis. (AR at 26.) However, this statement by the ALJ is not supported by the medical records. Specifically, Dr. Checo mentioned in his May 22, 2013 and June 25, 2013 treatment notes that he wanted plaintiff to *continue* taking anti-inflammatory medication. (AR at 681, 683.) The only point where Dr. Checo referenced that plaintiff was not taking anti-inflammatory medication was in his April 17, 2013 treatment notes. (AR at 684.) Further, the ALJ appears to have confused Dr. Checo's treatment notes from January 4, 2013, and February 20, 2013. Although the ALJ stated that Dr. Checo's January 4, 2013 notes indicate that plaintiff had taken anti-inflammatory medications on a per need basis only (AR at 26), such information actually comes from Dr. Checo's February 20, 2013 treatment notes, (*see* AR at 687). Dr. Checo's January 4, 2013 notes do not include any information regarding whether plaintiff had been prescribed or was taking anti-inflammatory medications. (*See* AR at 690-92.)

Regarding plaintiff's non-compliance with physical therapy, "a claimant's decision not to undergo a corrective process is not sufficient grounds to deny disability when there is a good reason for the refusal." *Pimenta*, 2006 WL 2356145, at *6 (citing *Pascariello v. Heckler*, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985)). Social Security Ruling ("SSR") 82-59 provides that a claimant may have legitimate reasons for refusing treatment and gives examples of legitimate reasons for failing to follow prescribed treatment, including the individual's inability to afford the treatment when no free resources are available and all possible resources have been explored. SSR 82-59, 1982 WL 31384, at *3-4. As noted *supra*, plaintiff's compliance or non-compliance with treatment is a question relating to plaintiff's credibility. As this is a question of credibility, the ALJ had an affirmative duty to develop the record. *Vincent v. Astrue*, No. 08-CV-0956 (VEB), 2010 WL 10827101, at *6 (N.D.N.Y. Mar. 30, 2010) ("[T]he duty to develop the record applies with full force in the context of the ALJ's credibility determination." (citing SSR 96-7P, 1996 WL 374186, at *3)). Here, the ALJ erred by failing to adequately develop the record, specifically with regard to plaintiff's inability to afford treatment due to lack of insurance coverage. *See id.* at *6, *8 (finding the "ALJ's credibility assessment was fatally undermined by his failure to adequately develop the record" where "he did not make any meaningful attempt to address [the plaintiff's] reasons for non-compliance"). The Court notes that plaintiff's inability to afford the directed treatment was touched on at the November 8, 2013 hearing (AR at 49, 51), and mentioned briefly in the ALJ's decision. (AR at 27.)

Additionally, the ALJ found that Dr. Checo's opinions were inconsistent with plaintiff's own testimony regarding his daily functioning. However, it is unclear what testimony the ALJ found to be inconsistent. Plaintiff testified that he only showers twice a week, despite leakage and incontinence, due to back pain and inability to get in and out of the shower. (AR at 47.) Plaintiff further testified that his days are spent watching television and playing guitar in his home, and reported that he does not go out much and has become a "hermit" due to his condition. (AR at 47, 49-50.) None of plaintiff's daily activities contradict Dr. Checo's findings or demonstrate the capacity to perform full-time work. *See, e.g.*, *Murdaugh v. Sec'y of Dep't of Health & Human Servs. of U.S.*, 837 F.2d 99, 102 (2d Cir. 1988) (noting the facts that claimant "waters his landlady's garden, occasionally visits friends and is able to get on and off an examination table can scarcely be said to controvert the medical evidence. In short, a claimant need not be an invalid to be found disabled under Title XVI of the Social Security Act, 42 U.S.C. § 1382c(a)(3)(A)"); *Brown v. Comm'r of Soc. Sec.*, No. 06-CV-3174 (ENV) (MDG), 2011 WL 1004696, at *5 (E.D.N.Y. Mar. 18, 2011) ("[E]ven to the extent that [the plaintiff's] daily activities were properly considered, the ALJ failed to place the burden on the Commissioner to show that those activities were evidence of residual functional capacity to perform full-time sedentary work.")

The Commissioner points to other evidence in the record that might have supported the ALJ's rejection of Dr. Checo's opinion. (*See* Def.'s Reply at 20.) Specifically, the Commissioner argues that "the opinion of the State agency medical consultant [Dr. Rees] contradicts Dr. Checo's findings and supports the ALJ's RFC." (*Id.*) Dr. Rees reviewed the evidence of record on February 5, 2013, and stated that she agreed with the RFC assessment for light work with appropriate postural and environmental restrictions. (AR at 626-27.) As an initial matter, Dr. Rees does not appear to be an orthopedic specialist. Further, there is no indication that the ALJ considered Dr. Rees' findings when making her determination. Dr. Rees' findings were not discussed by the ALJ; rather, the Commissioner is assuming that it was a factor the ALJ had in mind when deciding to give Dr. Checo's opinion little weight. Such assumptions are insufficient as a matter of law to bolster the ALJ's decision. *See Newbury v. Astrue*, 321 F. App'x 16, 18 (2d Cir. 2009) ("A reviewing court 'may not accept appellate counsel's post hoc rationalizations for agency action.'" (quoting *Snell*, 177 F.3d at 134)).

However, though mentioned briefly elsewhere, plaintiff's inability to afford treatment does not appear to have factored into the ALJ's determination regarding plaintiff's credibility.

Thus, because the record does not indicate that plaintiff was given the opportunity to show good cause for his failure to comply with his prescribed treatment regime, on remand, the ALJ should consider whether such refusal was justifiable, based on *inter alia*, plaintiff's inability to afford the treatment, plaintiff's insurance coverage, and plaintiff's exploration of free resources. *See, e.g.*, *Pimenta*, 2006 WL 2356145, at *5-6 ("To the extent that the ALJ relied on [the plaintiff's] refusal to have surgery without determining whether his refusal was justifiable, the decision was in error. Further inquiry is needed to determine whether the plaintiff's fear of surgery is a justifiable reason for refusing treatment"); *Gordon v. Schweiker*, 725 F.2d 231, 237 (4th Cir. 1984) (noting that Social Security Ruling 82-59 "provides that, before a person is denied benefits for failure to follow prescribed treatment, he will be afforded an opportunity to undergo the prescribed treatment or to show justifiable cause for failing to do so. The record discloses no provision of such an opportunity. This case, accordingly, should be remanded to the Secretary with instructions that [the plaintiff] be given the opportunity to show good cause for his failure to obtain treatment.").

In sum, having carefully reviewed the record, the Court concludes that the ALJ failed to adequately explain the reasons for determining that the opinion of the treating physician, Dr. Checo, should not be afforded controlling weight.[4] Given the failure to properly apply the treating physician rule, a remand is appropriate.[5,6]

## IV. CONCLUSION

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied. Plaintiff's cross-motion for judgment on the pleadings is denied, but plaintiff's motion to remand is granted. The case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated:     August 22, 2016
          Central Islip, NY

* * *

Plaintiff is represented by Charles E. Binder of the Law Offices of Harry J. Binder and Charles E. Binder, P.C., 60 East 42nd Street, Suite 520, New York, NY 10165. The Commissioner is represented by Robert L. Capers, United States Attorney, Eastern District of New York, by James R. Cho, 271

---

[4] Plaintiff also contends that the ALJ failed to properly apply the treating physician rule with respect to Dr. LaMonica. Because the Court concludes remand is appropriate because the ALJ erred in applying the treating physician rule with respect to Dr. Checo, the Court need not decide at this time whether the ALJ erred in assessing Dr. LaMonica's opinion. However, when re-considering the opinion of Dr. Checo on remand, the ALJ should consider whether that re-assessment alters her conclusion regarding Dr. LaMonica's opinion.

[5] Plaintiff also argues that the Appeals Council failed to consider new and material evidence (namely the June 2, 2014 Narrative Report and June 4, 2014 Spinal Impairment Questionnaire submitted from examining orthopedist Dr. Varriale). In the Appeals Council's denial of plaintiff's request for review, the Appeals Council stated that it also looked at Dr. Varriale's Narrative Report and Spinal Impairment Questionnaire, but found that "[t]he Administrative Law Judge decided your case through December 20, 2013" and "[t]his new information is about a later time." (AR at 2.) Thus, the Appeals Council found that the new evidence "does not affect the decision about whether you were disabled on or before December 20, 2013" and that plaintiff would need to apply for DIB again if he wanted the Appeals Council to consider whether he was disabled after December 20, 2013. (*Id.*) Because the Court concludes that the ALJ erred in applying the treating physician rule, and that a

remand is appropriate, the Court need not decide at this time whether the Appeals Council erred by not considering Dr. Varriale's Narrative Report and Spinal Impairment Questionnaire.

[6] Plaintiff also contends that the ALJ failed to properly evaluate plaintiff's credibility. Because the Court concludes that the ALJ erred in applying the treating physician rule, and that a remand is appropriate, the Court need not decide at this time whether the ALJ erred in assessing plaintiff's credibility. The Court notes that the ALJ concluded that "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely credible…." (AR at 25.) The Court recognizes that "[i]t is the function of the Secretary, not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (internal citations, quotations, and alteration omitted). However, to the extent that the ALJ, on remand, re-evaluates the evidence in addressing the treating physician rule, in accordance with this Memorandum and Order, the ALJ should also consider whether that re-evaluation alters his assessment of plaintiff's credibility in light of the evidence as a whole. The ALJ should also consider plaintiff's refusal to comply with prescribed treatment in the context of his credibility determination as described *supra*.

Cadman Plaza East, 7th Floor, Brooklyn, NY 11201.